**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


GERRY ROBINSON                                    CIVIL ACTION

VERSUS                                            NO. 05-5478

BURL CAIN, WARDEN                                 SECTION "A"(5)


<u>REPORT AND RECOMMENDATION</u>

This matter was originally referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that the instant petition be dismissed with prejudice.

<u>BACKGROUND</u>

In June, 2006, the undersigned magistrate judge issued a Report and Recommendation (rec. doc. 12), recommending that the instant matter be dismissed as untimely pursuant to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), codified at §2244(d), which generally provides that prisoners must file their habeas petitions within one year of the date their convictions become final.  In October, 2006, the district judge issued an Order remanding the matter to the magistrate judge, explaining that the Court was "disinclined to dismiss the petition" as untimely until it was "conclusively determined whether 28 U.S.C. §2244(d)(1)(B) applies to the closure of the law library due to fire;"[1] "and whether the facts set forth claiming that all prison functions were cancelled in the aftermath of Hurricane Katrina are enough to constitute equitable tolling."[2] (Rec. doc. 15, p. 3).

_____

[1] §2244(d)(1)(B) provides a narrow exception to the general rule that a prisoner must file his habeas petition within one year of the date his conviction becomes final.  Under the pertinent provision, the one-year statute of limitations is tolled during the period when an impediment to filing a habeas application "created by State action in violation of the Constitution or laws of the United States" is in existence "if the applicant was prevented from filing by such State action."  Petitioner contends that a fire in the prison law library prevented him from filing his habeas application and that said fire constitutes the type of "State action" contemplated under §2244(d)(1)(B) which justifies a tolling of the one-year prescriptive period.

[2] The Fifth Circuit has held that the AEDPA's one-year period of limitations may be equitably tolled, but only in exceptional circumstances.  Davis v. Johnson, 158 F.3d 806, 810 (5th Cir. 1998), cert. denied, 526 U.S. 1074, 119 S.Ct. 1474, 143 L.Ed.2d 558 (1999). "'Equitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights.'" Coleman v. Johnson, 184 F.3d 398, 402 (5th Cir. 1999), cert. denied, 529 U.S. 1057, 120 S.Ct. 1564, 146 L.Ed.2d 467 (2000), quoting Rashidi v. American President Lines, 96 F.3d 124, 128 (5th Cir. 1996).

Pursuant to the district court's remand, the undersigned magistrate judge issued a second Report and Recommendation (rec. doc. 28), determining that petitioner was not entitled to equitable tolling and, as such, recommending that the instant action be dismissed with prejudice as untimely. Thereafter, the district court adopted the magistrate judge's Report and Recommendation and issued Judgment dismissing petitioner's habeas application as untimely. (Rec. docs. 31 and 32).

In July, 2009, petitioner filed a motion to vacate the district court's Judgment and Order adopting the magistrate judge's recommendation that his petition be dismissed as untimely. (Rec. doc. 33). Petitioner argued that the Supreme Court case of <u>Jimenez v. Quarterman</u>, 129 S.Ct. 681 (2009), which changed the law in the Fifth Circuit, demonstrated that his habeas petition was in fact timely. The district court agreed and, on October 5, 2009, issued Order and Reasons (rec. doc. 34), granting petitioner's motion and ordering that the above-captioned matter be reopened and referred to the undersigned magistrate judge.

On October 8, 2009, the State filed a motion for reconsideration of the district court's October 5, 2009 Order and Reasons. (Rec. doc. 38). On October 28, 2009, the district court denied the State's motion for reconsideration. (Rec. doc. 41).

On November 24, 2009, the State filed a notice of its intent to appeal the district court's denial of its motion for

3

reconsideration.  (Rec. doc. 43).  On March 24, 2010, the State's appeal, pursuant to the State's motion, was dismissed (rec. doc. 50), and the matter is properly before this Court.

**PROCEDURAL HISTORY**

Petitioner Robinson is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On September 2, 1993, Robinson was charged by grand jury indictment with two counts of first degree murder.  On October 20, 1993, at his arraignment, Robinson pleaded not guilty.  On January 25, 1996, at the close of a three-day jury trial in Orleans Parish Criminal District Court, Robinson was found guilty of two counts of second degree murder.  On March 5, 1996, Robinson was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

On November 26, 1997, the Louisiana Fourth Circuit Court of Appeal affirmed Robinson's conviction in an unpublished errors patent decision, but remanded the matter to the trial court for clarification of the sentence and sentencing on count two.  State v. Robinson, No. 96-1284, 704 So.2d 993 (La. App. 4th Cir. 1997)(table).  Writs were denied by the Louisiana Supreme Court on May 8, 1998.  State v. Robinson, 718 So.2d 430 (La. 1998).[3]

On April 10, 2000, Robinson was granted an out-of-time appeal

---

[3]In the interim, Robinson had been resentenced to two concurrent life terms on May 4, 1998.

by the Louisiana Fourth Circuit Court of Appeal.  <u>State v. Robinson</u>, No. 2000-K-0372 (La. App. 4 Cir. 2000) (unpublished opinion).[4]  One of the claims raised in this out-of-time appeal was that trial counsel was unconstitutionally ineffective.  On April 17, 2002, the Louisiana Fourth Circuit Court of Appeal denied Robinson's out-of-time appeal, affirming his convictions and sentences.  <u>State v. Robinson</u>, No. 2002-KA-1305, 820 So.2d 571 (La. App. 4 Cir. 2002).  On May 30, 2003, the Louisiana Supreme Court denied Robinson's writ application, thereby rendering his convictions and sentences final.  <u>State v. Robinson</u>, No. 2002-KO-1640, 845 So.2d 1068 (La. 2003).  Robinson's conviction became final ninety days later, on August 28, 2003, when the ninety-day period for seeking a writ of certiorari from the U.S. Supreme Court expired and no application therefor was made.  <u>See</u> U.S. Sup. Ct. R. 13(1); <u>Roberts v. Cockrell</u>, 319 F.3d 690, 694 (5th Cir. 2003) (citing 28 U.S.C. §2244(d)(1)(A)).

On May 24, 2004, Robinson filed with the state district court a motion to correct an illegal sentence, claiming that he was resentenced without having a lawyer present.[5]  On July 8, 2004, Orleans Parish Criminal District Court Judge Calvin Johnson issued a Judgment denying Robinson's motion to correct an illegal

_____

[4]A copy of the Louisiana Fourth Circuit's April 10, 2000 opinion is contained in the State rec., vol. 5 of 10.

[5]A copy of petitioner's motion to correct an illegal sentence is contained in the State rec., vol. 9 of 10.

sentence, finding that a "review of the record shows that
defendant's counsel was present and finds no errors in
sentencing."[6]  On November 5, 2004, the Louisiana Fourth Circuit,
having "reviewed relator's motion to correct an illegal sentence
and find[ing] no error in the trial court's judgment", denied
Robinson's writ application in connection with his motion to
correct an illegal sentence.  State v. Robinson, No. 2004-K-1519
(La. App. 4 Cir. 2004) (unpublished opinion).[7]

On May 24, 2004, Robinson also filed with the state district
court an application for post-conviction relief.[8]  In this
application, Robinson raised the following claims: 1) that the
trial court should perform an in camera inspection of the grand
jury testimony and the district attorney's file; 2) that
prosecutors knowingly used false and perjured testimony at trial;
and, 3) that he was denied effective assistance of counsel on
appeal.  On July 16, 2004, Orleans Parish Criminal District Court
Judge Calvin Johnson issued a Judgment denying Robinson's

---

[6]A copy of the district court's unpublished July 8, 2004
Judgment is contained in the State rec., vol. 9 of 10.

[7]A copy of the state appellate court's November 5, 2004
unpublished opinion is contained in the State rec., vol. 9 of 10.
Robinson did not seek relief from the Louisiana Supreme Court in
connection with the state appellate court's November 5, 2004
adverse decision regarding his motion to correct an illegal
sentence.

[8]A copy of Robinson's May 24, 2004 application for post-
conviction relief is contained in the State rec., vol. 9 of 10.

application for post-conviction relief, finding that the "claims Applicant has raised have no merit."[9]   Similarly, the Louisiana Fourth Circuit Court of Appeal denied Robinson post-conviction relief.  On September 13, 2004, the state appellate court, finding "no error in the judgment of the district court denying relator's application for post-conviction relief", denied Robinson's writ application.  State v. Robinson, No. 2004-K-1399 (La. App. 4 Cir. 2004) (unpublished opinion).[10]   Finally, on August 19, 2005, the Louisiana Supreme Court denied Robinson's writ application pursuant to which Robinson sought relief in connection with the Louisiana Fourth Circuit's denial of post-conviction relief.  State ex rel. Robinson v. State, No. 2004-KH-2723, 908 So.2d 680 (La. 2005).

Robinson filed the instant action for federal habeas corpus relief on October 11, 2005, raising the same claims that he raised in his state post-conviction proceedings, namely:  1) that he was denied due process and a fair trial when the trial court did not perform an in camera inspection of the grand jury testimony and the district attorney's file; 2) that he was denied due process and a fair trial when prosecutors knowingly used false and perjured testimony at trial; and, 3) that he was denied due process and a fair trial by virtue of the ineffective assistance of counsel he

---

[9]A copy of the district court's unpublished July 16, 2004 Judgment is contained in the State rec., vol. 9 of 10.

[10]A copy of the state appellate court's September 13, 2004 unpublished opinion is contained in the State rec., vol. 9 of 10.

received.   (Rec. doc. 1, p. 12).   The State, in its response, admits that petitioner has properly exhausted his state court remedies as required under Rose v. Lundy, 455 U.S. 509 (1982), having raised the above claims in connection with his state post-conviction proceedings.   (Rec. doc. 56, pp. 4-5).   Further, the State, in its response (rec. doc. 56, p. 2-3), does not contest the timeliness of the instant action and, in light of Jimenez, supra, this Court agrees that petitioner's habeas application is in fact timely.   Accordingly, the Court shall proceed to address the merits of Robinson's claims following its review of the pertinent facts and standard of review.

**FACTS**[11]

Officer Karen Woods and her partners, Officers Demma and Williams, answered a call to 1419 ½ Milton Street on July 7, 1993. Once there, she found the front door locked, and she got no response to her knock.   One of her partners climbed in through a front window; because the front door was locked with a dead-lock bolt, the officers had to kick in the door in order to enter the apartment.   There they found three people who had been shot; one-a woman-was dead, and two men, who were still living, were taken to

---

[11]The facts as set forth hereinafter are as adjudicated by the State appellate tribunal in connection with Robinson's out-of-time appeal.   State v. Robinson, 820 So.2d 571, 573 (La.App. 4th Cir. 2002). While Robinson may not agree with the accuracy of the testimony against him, he does not contest the fact that the appellate court correctly summarized the record.

Charity Hospital where one of the men died.  Carla Whitfield, the resident of the apartment, gave a statement to Officer Woods.

Dr. Susan Garcia, the pathologist who performed the autopsies and an expert in forensic pathology, testified that Willie Nabonne, the nineteen-year-old victim, suffered fourteen gunshot wounds. Three of those wounds were lethal.  Willie Nabonne had a blood alcohol level of .01, but he had no illicit drugs in his system. Dr. Garcia also autopsied Danielle Brown, the sixteen-year-old victim, who suffered eleven gunshot wounds; one to the back of her head and one to her chest were lethal.  Canabanoids were found in Danielle Brown's system.

Sergeant Larry Nettles of the crime lab testified that he responded to the call to 1419 ½ Milton Street on July 7, 1993.  At that location he found twenty-seven .9 millimeter casings; he determined that twenty-four of the casings came from the same weapon.  Most of the casings were found within the apartment and a few outside.  He also found a .45 caliber gun in the kitchen and three .45 casings.

Officer James Charles Eaton investigated the homicides.  When he arrived on the scene, he saw the body of a woman on the kitchen floor and the kitchen covered with blood.   There were bullet casings on the sink, the stove, and all over the kitchen floor. Eaton also found a semi-automatic handgun near the body in the kitchen.  Officer Eaton took a statement from Carla Whitfield.

Based on information she gave him, the officer prepared a photographic line-up, and Ms. Whitfield selected the defendant's picture.

Sergeant Rodney Bailey of the homicide division conducted a follow-up investigation of the deaths of Danielle Brown and Willie Nabonne. Sergeant Bailey met with Jeffrey Hughes who survived the gunfire in the apartment. Jeffrey Hughes identified the defendant as the man with the assault gun who shot him, Brown, and Nabonne.

Carla Whitfield testified that the defendant is the father of her daughter who was four at the time of the incident. She gave the following version of the facts. On July 5, 1993, the defendant and his uncle came to her house. She, Jeffrey Hughes, Danielle Brown, and Willie Nabonne were present. The defendant asked Jeffery Hughes if he were involved with Ms. Whitfield. Then Hughes and the defendant began fighting, and Willie Nabonne began shooting at the defendant's uncle. At some point Jeffery Hughes got the gun and used it to hit the defendant in the head. Later in the scuffle, the defendant said to his uncle, "Go run and get the gun out the car." However, the incident ended abruptly because Ms. Whitfield pushed the defendant out the front door; Whitfield and Danielle Brown insisted the other men leave by the back door. As he was leaving, the defendant threatened to "come and kill all of us." Early in the morning of July 7, 1993, Ms. Whitfield saw the defendant beating on the window and then heard him at the back door. Whitfield's daughter was with her as well as Hughes, Brown,

10

and Nabonne.  Whitfield began looking for the door key because the dead-bolt was locked; however, she could not find it.  Shortly thereafter, she heard the defendant breaking the window, and she immediately put her child in the closet and ran into the bathroom herself.

Jeffrey Hughes, who was twenty-three at the time of trial, testified that he was at Carla Whitfield's apartment on July 5, 1993, when the defendant arrived.  The defendant became angry that Hughes was in the house and began fighting with him.  Hughes admitted grabbing a gun and hitting the defendant on the head with it during the fight.  Hughes left the apartment that night but returned on the evening of July 6, 1993, and spent the night. Hughes awoke on July 7, 1993 to the sound of screaming.  He went into the kitchen to see Willie Nabonne and Danielle Brown trying to pry the door open with a knife.  When Hughes asked what they were doing, they answered, "Some dude is in the house trying to kill us."  Willie Nabonne was holding a gun which he said had three bullets in it.  Then the defendant entered the kitchen, turned toward Hughes, and said, "Now nigger, I got you"; he began shooting.  Jeffery Hughes was shot eleven times.  Hughes remembers Willie Nabonne asking him to go for help, but Hughes could not move.  Hughes spent two months in the hospital recovering from his gunshot wounds.

Janice Chandler Molere, whose apartment is near that of Carla

11

Whitfield, testified that on July 7, 1993, as she was saying goodby to her husband at 6:40 a.m., she heard gunshots.  She was in her kitchen a few minutes later when she saw a man come around the building and reload an automatic revolver.  Ms. Molere said she watched the man "enter a backdoor and gunshots went off."  About a week later Molere noticed Detective Bailey near her apartment and she told him what she had seen.

Monique Ravey, the defendant's aunt, testified that she took her nephew to Tulane Medical Center in July of 1993 because he had a gunshot wound in his arm.  He was treated and released the same day.

Ricardo Samuel Ravey, the nineteen-year-old uncle of the defendant, testified that he and the defendant caught the bus to Carla Whitfield's apartment on July 5, 1993, in order to pick up the defendant's daughter.  Once there, the defendant and Jeffrey Hughes began fighting, and the defendant asked Samuel to go to get help.  The defendant did not instruct him to get a gun, Samuel Ravey explained, because they did not have a gun or a car in which to conceal a gun.  As Ravey ran for help, Willie Nabonne began shooting at him.

Charlene Robinson, the mother of the defendant, testified that her son and Carla Whitfield had a five year relationship in 1993. The defendant supported his daughter financially, and Ms. Robinson kept the child for two or three years.  Ms. Robinson said that her

12

son never had a weapon in 1993.

Gerry Robinson, who was twenty-four at the time of trial, testified that he turned himself in to the police on July 9, 1993. When his daughter was born in 1989, Robinson quit school to take a job so as to support her, he said, and he was working two jobs in 1993. On July 5, 1993, about 8:30 p.m., he went to Carla's to pick up the child, but Carla refused to let the child leave with him. Jeffery Hughes, Danielle Brown, and Willie Nabonne were in the living room. An angry exchange of words between the defendant and Hughes led to a fight. During the tussle, Hughes hit him on the head with a gun more than once. The defendant called to his uncle, who had accompanied him, to run for help. Nabonne followed the uncle and shot at him several times. The defendant left the apartment and called 911; when the police officer came, the defendant could not tell him the names of the people in the apartment other than Carla Whitfield, and so the defendant decided not to file a report about the incident. On July 6, 1993, the defendant spoke to Carla on the telephone, and she reassured him that he could get his daughter anytime he wanted. On July 7, 1993, the defendant armed himself before going to Carla's because he was frightened. He said he did not know what kind of gun he had, but everyone called it an "uzi" or a "mac-10." He had no intent to kill anyone there, he stated. When he arrived at the apartment, he tapped on the windows and kicked the door to awaken Carla. Because

she did not answer, he entered through the bedroom window.  He was standing between the kitchen and living room when he noticed shadows, and shortly thereafter he was shot in the arm.  He panicked, grabbed his gun and began shooting at the shadows.  Gerry Robinson said his .9 millimeter gun holds twenty-five bullets.  He denied reloading it. When he was treated for his gunshot wound at Tulane Medical Center, he told the attendants there that he was robbed in the Fischer Housing Project.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1).  The United States

Supreme Court has noted:

> §2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams[ v. Taylor</u>, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §2254(d)(2); <u>see also</u> <u>Hill</u>, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

## **MERITS**

### **In Camera Inspection of Grand Jury Testimony and District Attorney's File**

Robinson argues that he was denied a fair trial when the trial court failed to perform an in camera inspection of the grand jury testimony of Jeffery Hughes and the district attorney's file for

15

the purpose of locating exculpatory and/or impeachment evidence. According to Robinson, this error on the part of the trial court constituted a <u>Brady</u> violation.  Robinson's belief that Hughes' grand jury testimony, along with the district attorney's file, contained <u>Brady</u> material is based upon the fact that Hughes' trial testimony conflicted with testimony provided by investigating officers and conflicted with some of Hughes' earlier statements. (Rec. doc. 1, p. 14).

In <u>Brady v. Maryland</u>, 373 U.S. 83, 87-88 (1963), the United States Supreme Court held that "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment."  That rule has been expanded to include evidence which impeaches the testimony of a witness, where the reliability or credibility of the witness may be determinative of guilt or innocence.  <u>Giglio v. United States</u>, 405 U.S. 150, 153-55 (1972).  Evidence is material if there is a "'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985).  However, the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense. <u>U.S. v. Agurs</u>, 427 U.S.

16

97, 109-110 (1976).

To the extent Jeffrey Hughes' grand jury testimony, along with information contained in the district attorney's file, may have contained information that could have been used to impeach Hughes at trial, it is not reasonably probable that such impeachment evidence would have been sufficient to undermine confidence in the outcome of the case given the strength of the State's evidence against Robinson.  In addressing Robinson's claim that there was insufficient evidence to support his conviction, the Louisiana Fourth Circuit recounted the evidence supporting his guilt:

> Hughes testified that after defendant shot him, Willie Nabonne and Danielle Brown in the kitchen, defendant left the room.  Hughes subsequently heard shots coming from outside. Hughes said bullets came in through the back door and hit Willie Nabonne.
>
> Janice Chandler Molere testified that in the early morning hours of July 7, 1993, she heard shooting, and shortly thereafter saw an individual come around the building, reload a gun, and shoot towards Ms. Whitfield's back door.
>
> Defendant cites inconsistencies between Jeffrey Hughes' testimony and his statements to police, as well as Hughes' chronology of events.  However, insofar as the issue of credibility, defendant admitted to the jury that he lied to hospital personnel where he went for treatment of the single gunshot wound to his arm that he sustained that night, telling them that he was shot when someone robbed him.
>
> Defendant does not dispute that he shot Willie Nabonne and Danielle Brown to death.  He does not dispute that he shot Nabonne fourteen times, Ms. Brown eleven times, and Jeffrey Hughes eleven times.  All these acts occurred after he broke into Ms. Whitfield's residence, armed with a twenty-five shot firearm, two days after

being beaten and essentially chased from the residence,
after he started a fight there with Jeffrey Hughes.
Defendant apparently shot the three victims inside of the
kitchen, then left the residence, went around outside to
the back door, which was to the kitchen, reloaded his
twenty-five shot firearm, and then shot into the back
door, striking at least Willie Nabonne.

Despite any inconsistencies in Hughes' testimony,
viewing the evidence in a light most favorable to the
prosecution, any rational trier of fact could have found
beyond a reasonable doubt that when defendant shot Willie
Nabonne and Danielle Brown, he had the specific intent to
kill them or inflict great bodily harm upon them.   That
Willie Nabonne or Jeffrey Hughes may have shot defendant
once in the arm in self defense does not alter this
conclusion.

Robinson, 820 So.2d at 577-578.

Additionally, Robinson provides no specifics regarding what
evidence an in camera review of the grand jury transcript and the
district attorney's file would have produced.  Instead, it appears
that Robinson simply believes the trial court should have performed
a fishing expedition in the hope that exculpatory or impeachment
evidence would be uncovered.   In the absence of a showing of a
"particularized need" for such discovery, petitioner is not
entitled to habeas corpus relief, especially in the context of a
request for grand jury testimony.  See generally Pittsburgh Plate
Glass Co., v. United States, 360 U.S. 395, 399-401 (1959) (because
defense failed to meet its burden of showing a "particularized
need", Supreme Court affirmed trial court's refusal to order
disclosure of trial witness's grand jury testimony to criminal
defendant).  Accordingly, Robinson's claim for habeas corpus relief

18

is without merit.

### Prosecutors Knowingly Used False and Perjured Testimony

Robinson argues that prosecutors unconstitutionally allowed Jeffery Hughes to offer perjured testimony at trial. Robinson's argument in this regard is based on the fact that Hughes' trial testimony conflicted at one point with an earlier statement he provided to police and, at another point, with testimony provided by an investigating official.

Regarding the discrepancy in Hughes' trial testimony and his earlier statement to police, Robinson notes that Hughes testified at trial that the July 5, 1993 altercation commenced when Robinson questioned him about his relationship with Ms. Whitfield. In contrast, Hughes initially told police that the fight broke out when Robinson demanded his daughter. (Rec. doc. 1, p. 16).

As for the discrepancy between Hughes' trial testimony and the testimony of a police official, Robinson points to the fact that Hughes testified that he never possessed a handgun and Officer Woods testified that EMS personnel informed that one of the victims was in possession of a handgun and Ms. Whitfield advised that the handgun belonged to "Jeff". (Rec. doc. 1, p. 16; see also Robinson, 820 So.2d at 582).

A petitioner has the burden of showing that false testimony

was given, that it was material, that it would have affected the
jury's verdict, and that the prosecution used it knowing that it
was, in fact, false.  <u>Giglio v. United States</u>, 405 U.S. 150, 154
(1972); <u>Creel v. Johnson</u>, 162 F.3d 385, 391 (5th Cir.1998), <u>cert</u>.
<u>denied</u>, 526 U.S. 1148, 119 S.Ct. 2027, 143 L.Ed.2d 1038 (1999).
Contradictory testimony from witnesses, inconsistencies within a
witness's testimony, and conflicts between reports or in statements
do not establish perjury.  <u>Koch v. Puckett</u>, 907 F.2d 524, 531 (5th
Cir. 1990) (contradictory testimony from witnesses or
inconsistencies in a witness's testimony at trial are to be
resolved by the trier of fact and do not suffice to establish that
certain testimony was perjured); <u>United States v. Martinez-Mercado</u>,
888 F.2d 1484, 1492 (5th Cir. 1989) (the omission of certain facts
from the reports and written statements of the prosecution's
witnesses, alone, is not adequate to put the prosecution on notice
of perjury on their part, much less establish such perjury in fact
occurred).

Clearly, the two representations provided by Robinson of
alleged false trial testimony on the part of Jeffrey Hughes is
insufficient to satisfy his burden of proof.  Accordingly, the
instant claim for habeas corpus relief is without merit.

**Ineffective Assistance of Counsel**

Robinson argues that the attorney who represented him in

20

connection with his out-of-time appeal was ineffective due to her failure to adequately present his claim that trial counsel was ineffective.    In an effort to substantiate his ineffective appellate assistance claim, Robinson raises arguments concerning the alleged ineffectiveness of trial counsel, arguments raised by him on post-conviction, but not raised by direct appeal counsel, and urges this court to "re-review" said arguments.  (Rec. doc. 1, p. 20).

To prove ineffectiveness on the part of trial and/or appellate counsel, a petitioner must satisfy the two-prong test enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  See Busby v. Dretke, 359 F.3d 708, 714 (5th Cir.), cert. denied, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004) (citations omitted) ("The familiar Strickland framework applies to a prisoner's claim that his appellate counsel was ineffective for failing to raise a certain issue on appeal.").  Under Strickland, a petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the Strickland test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993), <u>citing</u> <u>Strickland</u>, 466 U.S. at 690.   To prove prejudice under the <u>Strickland</u> standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

Robinson argues that appellate counsel was deficient because she failed to submit evidence to substantiate his claim that trial counsel was deficient due to his heavy workload and the demands of a judicial system which prevented him from devoting the requisite time to Robinson's case.   However, Robinson has similarly provided no evidence to show that trial counsel was suffering from restraints associated with a heavy workload.

In support of his assertion that trial counsel was laboring under too heavy of a workload to adequately represent him, Robinson merely cites <u>State v. Peart</u>, 621 So.2d 780 (La. 1993).   However, <u>Peart</u> does not stand for the proposition that indigent defendants in one given section of Orleans Parish Criminal District Court <u>per se</u> received ineffective assistance of counsel.   Instead, the Louisiana Supreme Court rejected such a notion, remanding the matter for the purpose of determining on a case by case basis whether particular indigent defendants were not effectively represented.   <u>See</u> <u>Peart</u>, 621 So.2d at 783.   The Court further notes that Robinson's trial was handled by an *ad hoc* jurist, not by the

judge involved in <u>Peart</u>.  It is also unclear whether Robinson's court appointed counsel regularly handled cases in the section of court under scrutiny in <u>Peart</u> but, suffice it to say, his attorney was not the same person who functioned as a public defender in <u>Peart</u>.  Lastly, <u>Peart</u> was decided 2 1/2 years before Robinson was tried and there is no reason to assume that Robinson's counsel had the same onerous caseload to deal with as did the attorney in <u>Peart</u>.

Robinson, in support of the instant claim, also raises several arguments supporting his assertion that he received ineffective trial representation, arguments which he raised on post-conviction because his appellate counsel failed to raise them on direct appeal.  Specifically, Robinson claims that he received ineffective representation at trial because he was represented by only one counsel in his first-degree murder case rather than by two counsel as required under Louisiana law.  Further, Robinson claims trial counsel was ineffective because he:  1) failed to interview the State's witnesses; 2) failed to assert a "justification defense" and request "a specific jury instruction on justification"; 3) failed to contact and interview expert witnesses; 4) failed to "appear in court for hearings or trial"; 5) failed to "maintain regular contact with petitioner or return phone calls"; and, 6) failed to inform petitioner that he did not have to testify at trial and did not explain that the State had the burden

of proving guilt beyond a reasonable doubt.  (Rec. doc. 1, p. 22).
For the following reasons, the above arguments do not warrant a
finding that trial counsel was unconstitutionally ineffective.

First, it is well established that federal habeas review is
limited to questions of constitutional dimension.  <u>See</u> <u>generally</u>
<u>Jernigan v. Collins</u>, 980 F.2d 292, 298 (5th Cir. 1992), <u>cert</u>.
<u>denied</u>, 508 U.S. 978 (1993); <u>Castillo v. Johnson</u>, 141 F.3d 218, 222
and 224 (5th Cir.), <u>cert</u>. <u>denied</u>, 524 U.S. 979 (1998).  Absent a
due process violation, the fact that state law may have been
violated by virtue of the fact that Robinson was not appointed two
attorneys to represent him at trial is of no moment for purposes of
attaining federal habeas corpus relief.  Further, Robinson was not
convicted of first degree murder.  Under Louisiana law, he had no
right to two attorneys on a second degree murder charge which is
what he was ultimately convicted of by the jury.

Second, Robinson makes no showing of how he was prejudiced by
virtue of counsel's alleged failure to maintain regular contact
with him and return his phone calls, alleged failure to inform him
of his right not to testify and of the State's burden of proof, and
failure to contact and interview expert witnesses.  Indeed,
Robinson's argument, made to the jury by his attorney in closing,
that he should be convicted of the lesser offense of manslaughter
virtually required his testimony.  His argument that he did not
know that he had a right to remain silent is inconsistent with the

24

assertion of this position.   Lastly, the Court notes that, in closing argument, Robinson's counsel told the jury that "[he] didn't keep [Robinson] off the stand like some lawyers do.   You heard from him.   **He was open to that.**"   State rec., vol 3 of 10, p. 10.   These statements by counsel belie Robinson's current self-serving argument that he was ill-informed of his Fifth Amendment rights.   Rather, it would appear to be a matter of trial strategy that Robinson testify in an effort to convince the fact finder that he was guilty of a lesser offense than the one with which he was charged.

With regard to counsel's failure to interview the State's witnesses, Robinson fails to establish that he suffered any prejudice.   Specifically, Robinson appears to argue that his attorney stated the witnesses offered no surprises at trial.   However, Robinson states that such a fortunate outcome "is attributable to pure luck, not to any due diligence on [counsel's] part because he exercised none."   (Rec. doc. 1, p. 23).

An alleged lack of due diligence on the part of counsel may reflect a deficiency on the part of counsel, but, as set forth above, Robinson must show that counsel was deficient and that he was prejudiced by counsel's deficiency.   Clearly, Robinson has failed to satisfy Strickland's prejudice prong.

Robinson, in connection with his allegation that counsel was ineffective due to his failure to interview the State's witnesses,

suggests that had counsel performed such interviews he could have uncovered "evidence of the victim's violent tendencies (that he carried a gun)". (Rec. doc. 1, p. 23). While Robinson provides no specifics regarding the above suggestion, it appears, based upon a reading of <u>Robinson</u>, 820 So.2d at 582, that he may be referring to counsel's failure to interview Officer Karen Woods. Woods testified at trial that EMS personnel informed her that "one of the persons they were treating had a gun on his person." <u>Id</u>. When asked at trial whether she learned the name of the person who had the gun, Officer Woods replied "that Ms. Whitfield told her the persons's name was 'Jeff'", i.e. Jeffrey Hughes. <u>Id</u>. According to Robinson, had defense counsel interviewed Officer Woods, counsel "could have developed this important information at trial." (Rec. doc. 1, p. 23).

The fact that Jeffrey Hughes may have had a gun on his person at the time Robinson shot him eleven times was brought to the jury's attention via the testimony of Officer Woods. Robinson fails to explain how a pre-trial interview with Woods could have further "developed" this information. Accordingly, once again, Robinson has failed to show how he was prejudiced by counsel's failure to interview Officer Woods prior to trial.

As for Robinson's claim that counsel "did not appear in court for hearings or trial", Robinson provides no support for said claim, setting forth no particular hearing or court proceeding

where counsel failed to appear.  Further, this Court's review of the trial transcript reflects that defense counsel was present throughout the proceedings.  (<u>See</u> State rec., vol. 3 of 10).

Robinson's claim that counsel was ineffective for failing to assert a "justification defense" and request "a specific jury instruction on justification" is also without merit based upon his inability to show how he was prejudiced.  As the Louisiana Fourth Circuit inferred on direct appeal, the idea that Robinson's actions were justified based upon an earlier altercation with the victims and by the fact that Willie Nabonne or Jeffery Hughes shot Robinson once in the arm, is undermined by the undisputed fact that Robinson violently shot Willie Nabonne fourteen times, Danielle Brown eleven times, and Jeffrey Hughes eleven times.  <u>Robinson</u>, 820 So.2d at 578.  In this same vein, Robinson suggests that counsel was deficient in failing to develop Jeffrey Hughes alleged "violent tendencies" by not introducing into evidence "the N.C.I.C. report". (Rec. doc. 1, p. 23).  However, Robinson provides no insight into what such a report would have shown.  Further, even if such a report reflected that Hughes had a criminal record, such a fact would not have overcome the overwhelming evidence supporting Robinson's second degree murder convictions.  Again, Robinson has failed to show that he suffered any prejudice.

Accordingly;

**RECOMMENDATION**

It is hereby RECOMMENDED that the petition of Gerry Robinson for habeas corpus relief be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996)(en banc).[12]

New Orleans, Louisiana, this __4th__ day of _____February_____, 2011.

_Alma L. Chasez_
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[12]Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.

28